

# In the
# Missouri Court of Appeals
## Western District

SULTANY TRUCKING, LLC AND
SULTANY FARMS, LLC,

        **Appellants,**

v.

MISSOURI CLEAN WATER
COMMISSION AND MISSOURI
DEPARTMENT OF NATURAL
RESOURCES,

        **Respondents.**

**WD85445**
**OPINION FILED:**
**March 21, 2023**

**Appeal from the Circuit Court of Platte County, Missouri**
The Honorable Thomas Clark Fincham, Judge

Before Division Three: Thomas N. Chapman, Presiding Judge, Mark D. Pfeiffer, Judge,
Cynthia L. Martin, Judge

Sultany Trucking, LLC and Sultany Farms, LLC (collectively, "Appellants") appeal

from the circuit court's judgment affirming a decision issued by the Missouri Clean Water

Commission ("CWC") which imposed an administrative penalty of $31,865 against

Appellants for violations of chapter 644, the Missouri Clean Water Law ("Clean Water Law").[1] Finding no error, we affirm.

## Factual and Procedural History[2]

Michael Sultany ("Sultany") is the registered agent for Appellants. Sultany owns Sultany Trucking, LLC, and works for Sultany Farms, LLC. Appellants operate a farm and trucking business in Platte County, Missouri ("the Site"). An unnamed tributary ("Tributary") flows from the Site, and then into Todd Creek.

In the summer of 2018, the Missouri Department of Natural Resources ("DNR") received a report of potential dumping of animal waste and odor at the Site. On July 13, 2018, DNR conducted a "concern investigation," but found no violations of the Clean Water Law, and determined that the Site was not a water contaminant source at that time. A water contaminant source is a point of discharge "which causes or permits a water contaminant therefrom to enter waters of the state either directly or indirectly." Section 644.016(25). DNR did, however, provide recommendations regarding the Site "with the rationale of preventing any future discharges from the Site."

---

[1]All statutory references are to RSMo 2016 as supplemented through the dates of violations of the Clean Water Law in September, October, and November, 2018, unless otherwise indicated.

[2]We defer to the CWC's findings of fact as long as there exists sufficient competent and substantial evidence in the record to support them and they are not contrary to the overwhelming weight of the evidence. *Ferry v. Bd. of Educ. of Jefferson City Pub. Sch. Dist.*, 641 S.W.3d 203, 206 (Mo. banc 2022) (citations omitted). The factual and procedural history is developed from the administrative record and the Administrative Hearing Commission's findings of fact, which the CWC wholly adopted in its Final Decision. Appellants do not dispute the facts found by the CWC.

On September 20, 2018, Adam Paige ("Paige"), a supervisor with DNR, conducted an inspection at the Site. Paige observed sludge-like compost material in several piles mixed with starch, sawdust, and lime. The compost material was traveling from the Site's main stockpile area into the stormwater drainage ditch, which drains into the Tributary. The Tributary eventually meets with Todd Creek and their contents comingle at a mixing zone. Paige discovered water contaminants in the Tributary and Todd Creek that had been discharged from the Site. Contaminants flowing from the Site were caused by stormwater runoff that was mixed with the compost material and sludge. Paige determined that the Site was a water contaminant source because the contaminants originated at the Site. Appellants did not have a Missouri State Operating Permit ("Permit") to operate a water contaminant source. Paige discussed "best management practices [with Sultany], including pushing the compost piles away from the stormwater ditch and creating a temporary or permanent berm." A berm is an earthen or concrete wall which prevents discharges.

On October 3, 2018, Denise Eagan ("Eagan"), an engineer with DNR, conducted another inspection at the Site. Eagan observed sludge-like water contaminants in the Tributary and Todd Creek which had originated from the Site. Eagan provided Sultany advice and guidance on best management practices concerning the contaminants flowing from the Site.

On October 5, 2018, Paige conducted what DNR calls a "compliance assistance visit" at the Site, which "involves observing concerns and making recommendations." Paige noted that there were insufficient berms on the Site, and observed sludge in the

3

Tributary. Though Paige observed violations on the Site, the violations were not documented by DNR because Page was "only at the Site to provide help and guidance."

On October 9, 2018, Paige returned to the Site to conduct an inspection. Paige observed considerable amounts of sludge and discolored stormwater flowing from the Site and into the Tributary. Water at the mixing zone of the Tributary and Todd Creek was also discolored.

On October 18 and 22, 2018, Paige conducted compliance assistance visits at the Site. During both visits, Paige again observed sludge and discolored stormwater flowing from the Site into the Tributary, as well as insufficient berms. Paige contacted Sultany on both dates to discuss his observations and concerns, and also provided Sultany with advice and guidance about how to prevent the violations. On October 19, 2018, Paige emailed Sultany to recap a phone call wherein Paige notified Sultany that he needed to: (1) move the compost to a more central location away from the stormwater drainage ditch; (2) install structures to prevent the discharge of any stormwater that does come into contact with compost; and (3) obtain a Permit. Leigh Mitchell ("Mitchell"), an environmental manager with DNR, also followed up with Sultany in an email on October 23, 2018, summarizing Paige's visit. Mitchell's email again reminded Sultany of the three required actions that he needed to take, and advised that if he did not take the required actions, he would "remain in violation of [the] Clean Water Law, which may lead [to] elevated potential penalties."

Sultany Trucking hired a business to remove sludge from the Tributary on October 26, 27, and 29, 2018. However, sludge remained in the Tributary after these efforts.

On October 30, 2018, Paige conducted another compliance assistance visit at the

4

Site. Sludge compost material was on the Site, in the stormwater drainage ditch, in the Tributary and in Todd Creek. Sultany was notified of Paige's observations and again provided advice and guidance. Mitchell sent another email to Sultany which provided additional help and guidance. Mitchell also stated:

> [P]lease ensure that the berms at the main stockpile site are completed by Friday afternoon (11/02/2018). We will be in contact to schedule another site visit to confirm that this has been achieved. As mentioned previously, failure to meet these requirements may lead to increased potential penalties.

On November 2, 2018, Paige and Mitchell conducted an inspection at the Site. Sludge-like compost material was still present at the Site, in the stormwater drainage ditch, and the Tributary. The contaminants originated from the Site. On November 16, 2018, DNR sent Appellants a "Referral Notice of Violation" which detailed DNR's observations and findings during the previous Site investigations, inspections, and compliance assistance visits.

On May 6, 2019, Mitchell conducted an inspection at the Site. The Site was still a water contaminant source, as compost material was still present, and stormwater runoff was leaving the Site. Appellants still did not possess a Permit.

On September 18, 2020, DNR issued a "Notice and Order to Abate Violations and Pay Administrative Penalties" ("Penalty Order") to Appellants for the following violations of the Clean Water Law:

> The facility discharged water contaminants, compost wastewater runoff, into waters of the State, which reduced the quality of such waters below the Water Quality Standards established by the [CWC], in violation of sections 644.051.1(2) and 644.076.1 . . . ;

5

> [Appellants] operated, used, or maintained a water contaminant source which intermittently discharges to waters of the State without a [Permit] in violation of sections 644.051.2 and 644.076.1 . . . ; and

> [Appellants] caused pollution of Todd Creek and its tributary, waters of the State, in violation of sections 644.051.1(1) and 644.076.1 . . . .

The Penalty Order assessed an administrative penalty of $31,865 and ordered Appellants to complete other corrective actions, including to either obtain a Permit or submit proof that Appellants had ceased composting operations and wastewater discharges and properly disposed of composting and waste material. The administrative penalty was calculated according to 10 CSR 20-3.010 as reflected on the Penalty Matrix Worksheet utilized by DNR.

In this case, DNR used two Penalty Matrix Worksheets, one for the Tributary, and one for Todd Creek. The Penalty Matrix Worksheets identified ten instances of "Documented Noncompliance," or violations of the Clean Water Law, for the Tributary and two for Todd Creek. The violations involving the Tributary consisted of four instances of documented noncompliance with section 644.051.1(2) on September 20, October 3, October 9, and November 2, 2018; four instances of documented noncompliance with section 644.051.2 on those same dates; and two instances of documented noncompliance with section 644.051.1(1) on September 2 and October 3, 2018. The violations involving Todd Creek consisted of two instances of documented noncompliance with section 644.051.1(2) on September 20 and October 3, 2018.

On October 14, 2020, Appellants filed a complaint appealing the Penalty Order with the Administrative Hearing Commission ("AHC"). Following a multi-day hearing, the

6

AHC issued a recommended decision with findings of fact and conclusions of law ("Recommended Decision"). The Recommended Decision upheld DNR's Penalty Order, but recommended modification of the administrative penalty to $22,699. The AHC recommended modification of the administrative penalty because it agreed with Appellants that DNR improperly assessed ten points in the Facility Responsiveness category on the Penalty Matrix Worksheets. The AHC transmitted its Recommended Decision, record, and transcript of the proceedings to the CWC, which then had the authority to render a final decision pursuant to sections 621.250.1 and 644.056.3.

The CWC reviewed the record of the proceedings before the AHC and considered arguments of counsel. The CWC issued its Final Decision on April 12, 2021. The Final Decision adopted all of the AHC's findings of fact, and all of the AHC's conclusions of law, except that the CWC rejected the AHC's recommended reduction of the administrative penalty, and the reasons asserted for that reduction, and instead approved the amount of $31,865 assessed by DNR.

On May 10, 2021, Appellants filed a Petition for Judicial Review of the CWC's Final Decision in the Circuit Court of Platte County, Missouri pursuant to section 644.071.1. The circuit court reviewed the administrative record and briefs filed by the parties, and affirmed the CWC's Final Decision.

This appeal follows. Other facts will be discussed as pertinent to the points on appeal.

7

## Standard of Review

When a circuit court's judgment reviewing an administrative decision is appealed, we "review the agency's decision rather than the judgment of the circuit court." *Steck v. Mo. Dep't. of Nat. Res.*, 623 S.W.3d 176, 180 (Mo. App. W.D. 2021) (quoting *Danna v. Mo. Dep't of Soc. Servs., Family Support Div.*, 449 S.W.3d 821, 823 (Mo. App. W.D. 2014)).  We will uphold the CWC's decision unless its action:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any other reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

Section 536.140.2.

"[Q]uestions of law are not committed to the discretion of administrative agencies, nor dependent on their expertise, but are questions 'for the courts ultimately to resolve on judicial review when called upon to do so.'" *Ferry v. Bd. of Educ. of Jefferson City Pub. Sch. Dist.*, 641 S.W.3d 203, 207 (Mo. banc 2022) (quoting *Bird v. Mo. Bd. of Architects, Pro. Eng'rs, Pro. Land Surveyors & Landscape Architects*, 259 S.W.3d 516, 519 (Mo. banc 2008)).  We review "questions of law, including questions of statutory interpretation, *de novo*." *Id.* (citation omitted).

**Analysis**

Appellants raise eight points on appeal. None of the points challenge the factual findings set forth in the AHC's Recommended Decision and adopted by the CWC in its Final Decision. Instead, Appellants' points one through seven argue that the CWC committed legal error in the manner in which it assessed the administrative penalty, while Appellants' eighth point on appeal argues that the CWC committed legal error when it ordered Appellants to take abatement action.

***Point One***

Appellants' first point on appeal argues that the CWC's penalty assessment exceeded the "$10,000 per day" limit set forth in section 644.076.1 and 10 CSR 20-3.010(1)(A), and that the assessment is therefore in excess of the CWC's statutory authority and unauthorized by law.

Appellants' Point One is not preserved for our review. Rule 84.04(e) requires each point on appeal to include a "concise statement describing whether the error was preserved for appellate review; [and] if so, how it was preserved." "[F]actual assertions purporting to demonstrate such preservation, like all other factual assertions in the argument, 'shall have specific page references to the relevant portion of the record on appeal.'" *Hale v. Burlington N. & Santa Fe Ry. Co.*, 638 S.W.3d 49, 61 (Mo. App. S.D. 2021) (quoting Rule 84.04(e)).

> This means that Rule 84.04(e) requires more than a conclusory preservation statement. A preservation statement, while concise, must nevertheless precisely identify with specific page references to the relevant portion of the record on appeal both (1) the challenged [tribunal] ruling or action challenged in the point relied on and (2) how the legal reasons and the context

9

of the case supporting those legal reasons as the claim for reversible error asserted in the point relied on were timely and specifically presented to the [tribunal] in relation to the [tribunal] making or taking the challenged ruling or action.

*Id.* "While perfection is not required, compliance with appellate briefing rules is mandatory to ensure that appellate courts do not become advocates." *Id.* at 62 (quoting *Burgan v. Newman*, 618 S.W.3d 712, 714 (Mo. App. E.D. 2021)).

In this case, preservation of a claim of error for appellate review requires Appellants to demonstrate that they raised the challenge presented by each point relied on in both the CWC and the circuit court. "The general rule is that a court should not set aside administrative actions unless the agency has been given a prior opportunity, on timely request by the complainant, to consider the point at issue." *Morfin v. Werdehausen*, 448 S.W.3d 343, 349 (Mo. App. W.D. 2014) (quoting *Mills v. Fed. Soldiers Home*, 549 S.W.2d 862, 868 (Mo. banc 1977)); *see also Ocvina v. Bd. of Adjustment of City of St. Louis*, 402 S.W.3d 125, 129 (Mo. App. E.D. 2013) (quoting *Martin Oil Co. v. Mo. Hwy. & Transp. Comm'n*, 2 S.W.3d 144, 149 (Mo. App. S.D. 1999)) ("Generally, administrative actions should not be set aside without an opportunity for the agency, on timely request by the complainant, to consider the issue, unless injustice might otherwise result. . . ."). Moreover, "[c]ircuit and appellate court review of administrative decisions is . . . limited to matters raised in the petition for review." *Morfin*, 448 S.W.3d at 349 (quoting *Fitzgerald v. City of Maryland Heights*, 796 S.W.2d 52, 58 (Mo. App. E. D. 1990)) (appellant failed to preserve his argument for appeal when he did not raise a complaint regarding the argument in his

10

petition for judicial review); *see also Fin. Sols. & Assocs. v. Carnahan*, 316 S.W.3d 518, 522 n.4 (Mo. App. W.D. 2010).

The Rule 84.04(e) preservation statement set forth by Appellants in connection with Point One summarily states that "[e]rror was preserved for appellate review because [Appellants] challenged the improper penalty calculation in both the administrative hearing and the circuit court." This preservation statement is facially insufficient, and does not comply with Rule 84.04(e), as Appellants have not precisely identified with specific page references to the relevant portion of the record on appeal where the specific challenge to the penalty assessment at issue in Point One was raised with either the CWC or with the circuit court in the Petition for Judicial Review. The purpose of Rule 84.04(e) is to relieve this court of any appearance of serving as an advocate, as in the absence of a compliant preservation statement, this court is required to scour the record to independently determine whether the challenged error was duly raised in both the administrative tribunal and the circuit court.

As it happens, our *ex gratia* review of the record on appeals confirms that the challenge raised in Point One was not raised with the CWC or in Appellants' Petition for Judicial Review filed with the circuit court. Accordingly, Appellants' first point on appeal is not preserved for our review.

Point One is denied.[3]

---

[3]Even had we reached the merits of Appellants' Point One, we would have denied the point. Appellants argue that 10 CSR 20-3.010(1)(A) and section 644.076.1 provide that "the maximum penalty the CWC can assess is $10,000 per day" and thus they dispute that the CWC was authorized to assess $11,499.50 in penalties for four violations which

11

***Points Two and Five***

We combine discussion of Appellants' second and fifth points on appeal because they each challenge the CWC's imposition of a multiple violation penalty.

In their second point on appeal, Appellants assert that the CWC erred because it did not calculate a separate, individual penalty for each violation when it assessed a multiple violation penalty and therefore the penalty assessment exceeded the CWC's statutory authority and was unauthorized by law. The Rule 84.04(e) preservation statement for Appellants' second point on appeal is identical to the statement set forth in connection with Point One. For the reasons explained in connection with Point One, Appellants' Point Two is not preserved for our review because of material noncompliance with Rule 84.04(e). Our *ex gratia* review of the record on appeal confirms that the challenge raised in Point Two was not raised with the CWC or in Appellants' Petition for Judicial Review. *See Morfin*, 448 S.W.3d at 349; *Ocvina*, 402 S.W.3d at 129.

Point Two is denied.[4]

---

occurred on September 20, and $11,499.50 in penalties for four violations which occurred on October 3. "When interpreting a statute or a regulation, we look to the plain and ordinary meaning of the words used." *Interest of L.Q.F.*, 642 S.W.3d 327, 336 (Mo. App. E.D. 2022) (citation omitted). 10 CSR 20-3.010(1)(A) indicates that "the total penalty assessed per day of violation [may not] exceed the statutory maximum specified in section 644.076." Section 644.076.1 plainly permits "the assessment of a penalty not to exceed ten thousand dollars per day for each day, or part thereof, the violation occurred and continues to occur . . . ." The singular use of "violation" in both 10 CSR 20-3.010(1)(A) and section 644.076.1 indicates that the statutory limit is $10,000 per violation, per day, resulting in a total permitted penalty of up to $40,000 on September 20, 2018 and October 3, 2018. The CWC did not err when it assessed penalties for those dates which fell below that limit.

[4]Even had we reached the merits of Appellants' Point Two, we would have denied the point. When scoring the Penalty Matrix Worksheets, DNR assessed points under

12

Appellants' fifth point on appeal asserts that the CWC erroneously imposed a multiple violation penalty even though the violations were not independent of or substantially different from one another as required by 10 CSR 20-3.010(3)(B).[5]

appropriate categories where criteria was met based on Appellants' conduct and the nature of the Site. The number of points was then used to calculated a base penalty of $2,000 for the Tributary and $5,000 for Todd Creek. The base penalty was adjusted for the Tributary by $166.50 due to a history of noncompliance. The base penalties were then multiplied by the "number of days/violations calculated"-ten for the Tributary and two for Todd Creek. In the case of the Tributary, this amounted to a total proposed penalty of $21,665, and $10,000 for Todd Creek. DNR also added a $200 economic benefit due to Appellants' refusal to obtain a Permit, and therefore the total proposed penalty for both the Tributary and Todd Creek was $31,865. Appellants argue that the CWC was required "to calculate a separate, individual administrative penalty for each violation and then sum those penalties together for a final penalty" when completing the Penalty Matrix Worksheets. Appellants rely on 10 CSR 20-3.010(2)(B)7, which defines a "multiple violation penalty" as "the sum of individual administrative penalties assessed where two (2) or more violations are included in the same enforcement action." However, Appellants ignore subsection (B) to 10 CSR 20-3.010(3):

> (3) Determination of Penalties. . . .
>
> > (B) Multiple Violation Penalty. Penalties for multiple violations may be determined when a violation is independent of or substantially different from any other violation. The director *may* order a separate administrative penalty for that violation as set forth in this rule.

(Emphasis added). The permissive language contained in 10 CSR 20-3.010(3)(B) plainly refutes Appellants' argument that the CWC was required to calculate separate administrative penalties for each violation under the Penalty Matrix Worksheets. The CWC did not err when it imposed a collective penalty rather than individual penalties for each violation.

[5]Appellants' fifth point on appeal once again violates Rule 84.04(e) because their preservation statement fails to identify by specific reference to the record on appeal where the challenge raised in the point was raised with both the CWC and in their Petition for Judicial Review. Despite this serious briefing deficiency, we are exercising our discretion to review the merits of Appellants' Point Five, *ex gratia*, as we can readily determine from the record that the challenge raised in this point was raised with the CWC and in the Petition for Judicial Review.

Appellants argue, without citation to any authority, that the same conduct by Appellants (discharge of water contaminants from the Site) triggered multiple violations imposed on the same days, and that the violations are thus not independent of or substantially different from one another. We disagree with Appellants' contention.

10 CSR 20-3.010(3)(B) provides:

> Multiple Violation Penalty. Penalties for multiple violations may be determined when a violation is independent of or substantially different from any other violation. The director may order a separate administrative penalty for that violation as set forth in this rule.

On its Penalty Matrix Worksheets, DNR documented twelve violations of the Clean Water Law over four different dates--September 20, October 3, October 9, and November 2, 2018. Ten of those violations involved the Tributary and two involved Todd Creek. The Todd Creek violations consisted of two violations, on September 20 and October 3, of section 644.051.1(2), which makes it unlawful to "discharge any water contaminants into any waters of the state which reduce the quality of such waters below the water quality standards established by the [CWC]." With respect of the Tributary, DNR documented violations of section 644.051.1(2) on September 20, October 3, October 9, and November 2, and violations of section 644.051.2, which makes it unlawful "for any person to operate, use or maintain any water contaminant or point source" *without a permit*, on the same four days. Finally, Appellants were cited for violations of section 644.051.1(1), which makes it unlawful for any person to "cause pollution of any waters of the state or to place or cause or permit to be placed any water contaminant in a location where it is reasonably certain to cause pollution of any waters of the state," on September 20 and October 3.

14

The CWC's Final Decision found that the Tributary and Todd Creek are both waters of the state, and that they are independent bodies of water. Appellants do not dispute this finding. Violations which affect separate bodies of water, even if on the same day, are plainly independent violations. *See* section 644.016(27) ("waters of the state" defined as "all waters within the jurisdiction of this state, including all rivers, streams, lakes and other bodies of surface and subsurface water lying within or forming a part of the boundaries of the state which are not entirely confined and located completely upon lands owned, leased or otherwise controlled by a single person or by two or more persons jointly or as tenants in common."). The CWC's assessment of penalties because multiple violations occurred on September 20 and October 3, 2018 involving independent bodies of water is not erroneous.

In addition, a violation of section 644.051.2 is independent of and substantially different from a violation of section 644.051.1. Section 644.051.2 penalizes the maintenance or operation of a water contaminant source without a permit, a violation that could be assessed whether or not a water contaminant source has caused pollution. Section 644.051.1 penalizes the pollution caused by a water contaminant source and the discharge of contaminants into waters of the state. The CWC's assessment of penalties for the multiple violations of these regulations on the dates noted above is not erroneous.

That leaves only Appellants' complaint about multiple violation penalties assessed for violations of sections 644.051.1(1) and (2), an issue that implicates violations observed on September 20 and October 3 involving the Tributary. As noted, section 644.051.1(1) makes it unlawful for any person to "cause pollution of any waters of the state or to place

15

or cause or permit to be placed any water contaminant in a location where it is reasonably certain to cause pollution of any waters of the state."  Section 644.051.1(2) makes it unlawful "to discharge any water contaminants into any waters of the state which reduce the quality of such waters below the water quality standards established by the [CWC]."

By their plain terms, these regulations render independent and substantially different conduct unlawful.  Section 644.051.1(1) penalizes the maintenance of a water contaminant in a manner that is reasonably certain to cause pollution.  Section 644.051.1(2) penalizes actual pollution that results in objective, measurable impact on waters of the state.  The fact that a violation of section 644.051.1(1) may well foretell a violation of section 644.051.1(2), such that, once contamination has occurred, violations of both regulations can be found, affords no basis to challenge the independent and substantially different conduct proscribed by these regulations.  The CWC's assessment of penalties for the multiple violations of these regulations on September 20 and October 3 is not erroneous.

Point Five is denied.

### Points Three and Four

We combine discussion of Appellants' third and fourth points on appeal because they challenge the CWC's assessment of points under two categories on the Penalty Matrix Worksheets--Facility Responsiveness (Point Three) and Facility Compliance Status (Point Four).

The amount of an administrative penalty issued for violations of the Clean Water Law is determined according to 10 CSR 20-3.010(3).  DNR's Penalty Matrix Worksheets substantively follow the process set forth in 10 CSR 20-3.010.  First, DNR determined the

16

number of violations, and then an administrative penalty was assessed utilizing a points system which evaluated two factors, "the potential for harm posed by the violation and the extent to which the violation deviates from the requirements of the [] Clean Water Law." 10 CSR 20-3.010(3)(A)1, 2. 10 CSR 20-3.010(3)(A) sets forth categories for which DNR may assess a specified number of points if the criteria for the category is met. As more points are assessed, higher penalties are authorized. *See* 10 CSR 20-3.010(3)(A)3-4. Here, DNR documented twelve violations of the Clean Water Law and assessed points under applicable categories on the Penalty Matrix Worksheets in order to calculate the proposed penalty that was ultimately imposed by the CWC's Final Decision.

Appellants' Point Three[6] argues that the CWC erred in accepting DNR's assessment of ten points under the Facility Responsiveness category on the Penalty Matrix Worksheets. DNR assessed ten points in this category because it found that Appellants met the criteria which required that "[v]iolations continued after responsible party had been clearly informed, on at least three (3) separate occasions, of the noncompliance and the need to correct it." A DNR case manager testified that DNR "staff spoke with [Sultany] about the violations and the conditions of the site on more than three occasions," including in person, over the phone, and via e-mail. Appellants were cited for violations on September 20,

_____

[6]Appellants' third and fourth points on appeal once again violate Rule 84.04(e) because their preservation statements fail to identify by specific reference to the record on appeal where the challenge raised in the points was raised with both the CWC and in their Petition for Judicial Review. Despite this serious briefing deficiency, we are exercising our discretion to review the merits of Appellants' Points Three and Four, *ex gratia*, as we can readily determine from the record that the challenges raised in these points were raised with the CWC and in the Petition for Judicial Review, affording said petition a generous reading.

October 3, October 9, and November 2, 2018. The administrative record indicates that in addition to numerous emails and phone calls to Sultany, DNR visited the site in order to conduct an inspection or a compliance visit on the following dates: September 20, 2018; October 3, 5, 9, 18, 22, and 30, 2018; November 2, 2018; and May 6, 2019.

Appellants do not challenge that DNR staff communicated with Sultany about violations on each of the occasions noted above, and that these communications exceed three separate occasions. Appellants argue, however, that although 10 CSR 20-3.010(3)(A)2 authorizes the assessment of ten points in the Facility Responsiveness category, the requirement that "[v]iolations continued after responsible party had been clearly informed on at least three (3) separate occasions of the noncompliance and the need to correct it" must be construed to mean that until the responsible party is informed of the need to correct a determined noncompliance on three separate occasions, no violation supporting Facility Responsiveness points can be found to have occurred. As a result, Appellants argue that DNR had no authority to penalize Appellants for violations on September 20 and October 3, because on those dates Sultany had not yet been informed of noncompliance on three separate occasions. The AHC agreed with Appellants' interpretation of 10 CSR 20-3.010(3)(A)2, as in its Recommended Decision, it concluded that DNR had not made the requisite showing for the violations found on September 20 and October 3 to permit assessment of ten points for Facility Responsiveness. The CWC rejected the AHC's Recommended Decision in this regard, explaining:

> [The CWC] sees [the AHC's] approach as impractical and reads the rule as retrospective; in other words, if the violations continued, notwithstanding

18

that [DNR] had on three separate occasions pointed out the non-compliance and the need to correct it, ten points may be added . . . .

We agree with the CWC's interpretation of the Facility Responsiveness category criteria set forth in 10 CSR 20-3.010(3)(A)2. It is absurd to read the criteria for this category as requiring a violation to have persisted on three separate occasions, and for the responsible party to have been told of the violation on three separate occasions, before ten points can be assessed in the Facility Responsiveness category. By authorizing the assessment of ten Facility Responsiveness points if "[v]iolations *continued after* [a] responsible party had been clearly informed on at least three (3) separate occasions of the noncompliance and the need to correct it," the regulation plainly contemplates that once a violation is determined to have occurred, and once a responsible party has been advised of the violation on three occasions, the violation will be deemed to have continued such that assessment of penalty points is warranted. (Emphasis added). The penalty point category for Facility Responsiveness is plainly designed to incentivize responsible parties to take remedial action to address a determined violation as soon as possible. Appellants' urged construction of the regulation would have quite the opposite effect.

Here, it is plain in the record that violations were found on September 20 and October 3, 2018 (a finding Appellants do not contest), and that those violations continued despite Sultany being informed of the violations not only on September 20 and October 3, but also on multiple dates thereafter. The CWC's findings establish that Appellants were informed of their noncompliance and the need to correct determined violations on at least

19

eight separate occasions, yet, the violations continued into May 2019. The CWC did not err in assessing ten points under the Facility Responsiveness category.

Point Three is denied.

Appellants' fourth point on appeal[7] argues that the CWC erred when it assessed twenty-five points in the Facility Compliance Status category where the criteria required that DNR find a "[f]acility in noncompliance more than 67% of time during a period of at least three (3) consecutive months." 10 CSR 20-3.010(3)(A)2. On appeal, Appellants have not clearly explained why they believe the CWC erred by assessing twenty-five points in this category. Instead, they summarily assert that DNR failed to provide evidence that the Site was in noncompliance for the requisite period. Generously affording Appellants the benefit of the only specific argument raised with the CWC, we understand Appellants' contention to be that because DNR only found violations during a period from September 20, 2018 to November 2, 2018, it cannot be that Appellants were in noncompliance for sixty-seven percent of the time over three consecutive months.

Nothing in 10 CSR 20-3.010(3)(A)2 suggests that the period of noncompliance for purposes of the Facility Compliance Status category can only be calculated based on dates when violations are documented. DNR conducted an inspection at the Site on May 6, 2019, and found the Site was still in noncompliance such that violations first noted on September 20, 2018 remained an issue. The Site was still a water contaminant source on May 6, 2019, as DNR observed compost material present and stormwater runoff leaving the Site.

---

[7]*See* footnote 6, supra.

Appellants still did not have a Permit to operate a water contaminant source on May 6, 2019. The CWC found that "DNR attempted conference, conciliation, and persuasion between September 2018 and May 2019, and the violations were not completely corrected or remedied." Thus, DNR established that the Site was in noncompliance from September 20, 2018 until May 6, 2019--almost eight months. The CWC did not err in assessing twenty-five points under the Facility Compliance Status category.

Point Four is denied.

### *Point Six*

Appellants' sixth point on appeal argues that the CWC erred in assessing a penalty because DNR relied on a "'totality of the circumstances' factor that does not appear within" 10 CSR 20.3010 in order to impose points under the Facility Responsiveness and Facility Compliance Status categories. Appellants point out that "the term 'totality of the circumstances' appears nowhere" in 10 CSR 20.3010 and they contend that DNR's reliance on a totality of the circumstances factor fails to comply with section "536.021's procedural requirements for making, amending, or rescinding rules." We decline to review Appellants' sixth point on appeal on its merits because it is not preserved for our review. Appellants' point on appeal violates Rule 84.04(e) because it fails to indicate by specific reference to the record on appeal where the argument was raised with the CWC or the circuit court in Appellants' Petition for Judicial Review. Our *ex gratia* review of the record on appeal confirms that although Appellants arguably raised this issue with the CWC, the issue was not raised in Appellants' Petition for Judicial Review. *Morfin*, 448 S.W.3d at 349; *see also Fin. Solutions & Assocs.*, 316 S.W.3d at 522 n.4.

21

Point Six is denied.[8]

**Point Seven**

In their seventh point on appeal, Appellants argue that the CWC exceeded its statutory authority when it assessed a penalty for operating a water contaminant source without a Permit more than two years after DNR initially discovered that violation because the penalty violated section 644.079.3's statute of limitations.[9] Section 644.079.3 requires that "[a]ny administrative penalty must be assessed within two years following [DNR's] initial discovery of such alleged violation, or from the date [DNR] in the exercise of ordinary diligence should have discovered such alleged violation."

Appellants argue that they were required to obtain a Permit as of July 13, 2018 because "a permit is needed to operate *a water contaminant source* if there is a *potential*

---

[8]Even had we reached the merits of Appellants' Point Six we would have denied the point. Natalie Wigger ("Wigger"), case manager with the DNR Water Protection Program, drafted the Penalty Matrix Worksheets. Wigger provided testimony during the hearing before the AHC which detailed how she completed the Penalty Matrix Worksheets which calculated the $31,865 proposed penalty. Wigger testified that DNR looks at the "totality of the circumstances" when assessing points under the Facility Responsiveness and Facility Compliance Status categories. Wigger explained that by "totality of the circumstances," she meant that DNR does not look to one single violation or one single date of noncompliance, instead, DNR considers all of the facts and violations in the case. We disagree with Appellants' characterization of Wigger's testimony as establishing that DNR utilized a new or additional factor that is not provided for in 10 CSR 20.3010.

[9]Appellants' seventh point on appeal once again violates Rule 84.04(e) because their preservation statement fails to identify by specific reference to the record on appeal where the challenge raised in the point was raised with both the CWC and in their Petition for Judicial Review. Despite this serious briefing deficiency, we are exercising our discretion to review the merits of Appellants' Point Seven, *ex gratia*, as we can readily determine from the record that the challenge raised in this point was raised with the CWC and in the Petition for Judicial Review.

22

to discharge contaminants into waters of the state." (Emphasis added). Section 644.051.2 provides that "[i]t shall be unlawful for any person to operate, use or maintain any water contaminant or point source in this state that is subject to standards, rules or regulations promulgated pursuant to the provisions of sections 644.006 to 644.141 unless such person holds an operating permit from the [CWC] . . . ." Appellants' argument relies on the definitions of "water contaminant source" and "point source" found in sections 644.016(16) and (25). Appellants argue that section 644.016(25) defines "water contaminant source" "to include any installation that is a 'point source'" and that because "point source" is defined in section 644.016(16) as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged," that it is therefore "a violation for any person to operate an installation *that may discharge pollutants* without an operating permit." (Emphasis in Brief). We need not decide whether Appellants' interpretation of sections 644.051.2, 644.016(16), and 644.016(25) is correct.

Assuming without deciding that Appellants' reading of sections 644.051.2 and 644.016 is accurate, their argument nevertheless fails because the CWC found that on July 13, 2018, the Site was **not** a water contaminant source. Appellants' argument relies on a finding that the Site was a water contaminant source on July 13, 2018; however, the CWC found the opposite. Appellants do not dispute the CWC's finding, nor do they argue that it is unsupported by competent and substantial evidence upon the whole record, and we do not find that it is unsupported.[10] The CWC found that no violations were observed by DNR

---

[10]Moreover, even had Appellants disputed the CWC's finding that the Site was not a contaminant source on July 13, 2018, their assertion that the CWC "made a finding of

23

during its July 13, 2018 visit to the Site, "and because DNR found no violations, there was no reason to conduct a follow-up investigation without new information." Thus, it cannot be said that DNR did not exercise ordinary diligence or that it "should have discovered" that the Site was a water contaminant source on July 13, 2018. *See* section 644.079.3. It was not until DNR's September 20, 2018 inspection that it determined that the Site was a water contaminant source because Paige observed sludge-like compost material that originated at the Site and traveled into the Tributary and Todd Creek. Thus, section 644.079.3's two-year statute of limitation began to run on September 20, 2018. Because DNR issued its Penalty Order on September 18, 2020, the administrative penalty was assessed within the two-year statute of limitations, and the CWC's penalty assessment was not in error.

Point Seven is denied.

### *Point Eight*

Appellants' eighth point on appeal asserts that the CWC's order to obtain a permit "and take other abatement action" was "in excess of the statutory authority and unsupported by competent and substantial evidence upon the whole record" because DNR issued the

---

fact that, as of July 13, 2018, Appellants had a potential for discharges," misstates the CWC's findings. The CWC found that the report of the July 13 visit found "no discharge of contaminated stormwater . . . but some evidence of *potential past* discharges," and that an employee of DNR discussed recommendations to Sultany "with the rationale of preventing any future discharges from the Site." (Emphasis added). These facts do not establish that the CWC found that Appellants had a potential to discharge water contaminants. First, the fact that a site potentially had discharges in the past does not necessarily correspond to its potential for future discharges. Second, the CWC found that it is common practice for DNR to make such recommendations in order to help prevent violations of the Clean Water Law in the future.

Penalty Order "without providing evidence of a current violation [when the Penalty Order was issued on September 18, 2020] as required by [section] 644.056.3."[11]

We disagree with Appellants' contention that section 644.056.3 requires evidence of a current violation prior to the issuance of an abatement order. Section 644.056 permits DNR to investigate violations of the Clean Water Law and issue abatement orders. Sections 644.056.2-3 provide:

> 2. If, in the opinion of the director, the investigation discloses that a *violation does exist*, the director may, by conference, conciliation or persuasion, endeavor to *eliminate the violation*.
>
> 3. In case of the failure by conference, conciliation or persuasion to correct or remedy any claimed violation, or as required to immediately and effectively halt or eliminate any imminent or substantial endangerments to the health or welfare of persons resulting from the discharge of pollutants, the director may order abatement or request legal action by the attorney general. . . . The director shall cause to have issued and served upon the person complained against a written notice of the order or complaint, together with a copy of the order or complaint, which shall specify the provision of sections 644.006 to 644.141 or the standard, rule, limitation, or regulation adopted pursuant thereto, or the condition of the permit of which the person is alleged to be *in violation*, and a statement of the manner in

---

[11]Although Appellants' point relied on also complains of "other abatement action" taken by the CWC, they do not identify which actions they claim were ordered in error, nor do they develop the argument portion of their brief beyond their concern for the portion of the order directing them to obtain a Permit. "Arguments raised in the points relied on that are not supported by argument in the argument portion of the brief are deemed abandoned and present nothing for appellate review." *Lehmann v. Bd. of Educ. of Fayette R3 Sch. Dist.*, 649 S.W.3d 303, 309 (Mo. App. W.D. 2022) (quoting *Weisenburger v. City of St. Joseph*, 51 S.W.3d 119, 124 (Mo. App. W.D. 2001)).

Appellants' eighth point on appeal once again violates Rule 84.04(e) because their preservation statement fails to identify by specific reference to the record on appeal where the challenge raised in the point was raised with both the CWC and in their Petition for Judicial Review. Despite this serious briefing deficiency, we are exercising our discretion to review the merits of Appellants' Point Eight, *ex gratia*, as we can readily determine from the record that the challenge raised in this point was raised with the CWC and in the Petition for Judicial Review.

which and the extent to which the person is alleged to violate sections 644.006 to 644.141 or the standard, rule, limitation, or regulation, or condition of the permit. . . .

(Emphasis added.)

The CWC concluded that section 644.056.3 authorizes two circumstances where DNR may order abatement or request legal action from the attorney general: (1) when there is a failure to remedy a claimed violation after conference, conciliation or persuasion; or (2) "as required to immediately and effectively halt or eliminate any imminent or substantial endangerments to the health or welfare of persons resulting from the discharge of pollutants." Here, DNR's enforcement actions were authorized by the first circumstance. The CWC determined that Appellants failed to remedy violations after conference, conciliation and persuasion, a finding Appellants do not challenge, and a finding that is supported by competent and substantial evidence in the record in light of DNR's numerous visits, emails, and phone calls with Sultany concerning the violations.[12]

Appellants argue that "[t]he Legislature's use of the phrases 'violation does exist,' 'eliminate the violation,' 'fails to correct or remedy a violation,' and 'in violation' in sections 644.056.2 and .3 demonstrates that the Legislature intended to limit the authority to issue abatement orders to unresolved violations. We need not address that contention. Though

---

[12]Section 644.016(3) defines "conference, conciliation and persuasion" as "a process of verbal or written communications consisting of meetings, reports, correspondence or telephone conferences between authorized representatives of the department and the alleged violator. The process shall, at a minimum, consist of one offer to meet with the alleged violator tendered by the department. During any such meeting, the department and the alleged violator shall negotiate in good faith to eliminate the alleged violation and shall attempt to agree upon a plan to achieve compliance[.]"

26

Appellants argue that they no longer operated a water contaminant or point source at the time the abatement order was issued, and that all violations prior to that point had been remediated, the record does not demonstrate or establish these self-serving assertions, and the CWC made no such findings.

Appellants also argue that the CWC's Final Decision, which orders them to obtain a Permit, is unfair because they no longer operate a water contaminant or point source. The CWC made no such finding to support Appellants' self-serving contention that at the time of the Final Decision, they no longer operate a water contaminant or point source, and in fact, the CWC concluded that evidence concerning site visits after the issuance of the Penalty Order in September 2020 was irrelevant to the proceedings before it. More importantly, Appellants' argument ignores that DNR's initial Penalty Order directed Appellants to *either*: (1) obtain a Permit, *or* (2) submit proof that Appellants ceased composting operations and wastewater discharges and properly disposed of composting and waste material. Appellants chose neither option and instead elected to appeal the Penalty Order to the AHC. The AHC then found in its Recommended Decision that Appellants were required to obtain a Permit, with no reference being made to the alternative of submitting proof that offending operations on the Site had ceased. The CWC correspondingly found in the Final Decision that Appellants were properly required by the Penalty Order to secure a Permit, without reference to the alternative of submitting proof that offending operations on the Site had ceased. We find no fault in the CWC's Final Decision as Appellants failed to take timely advantage of the alternative offered by the

27

Penalty Order to submit proof that they had ceased composting operations and wastewater discharges and properly disposed of composting and waste material on the Site.[13]

The CWC's Final Decision directing Appellants to obtain a Permit was supported by competent and substantial evidence in the record and it did not exceed the CWC's statutory authority.

Point Eight is denied.

## Conclusion

The circuit court's judgment, which upheld the CWC's Final Decision, is affirmed.

_____
Cynthia L. Martin, Judge

All concur

---

[13]Nothing in this Opinion should be interpreted to prevent DNR or the CWC from electing to relieve Appellants of the obligation to secure a Permit for the Site, if to their satisfaction, a Permit is no longer required on the Site.

28